*United States of America v. Reyes*

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2025

Submitted: September 8, 2025
Decided: January 7, 2026

Docket No. 24-2333

UNITED STATES OF AMERICA,

*Plaintiff–Appellee,*

–v.–

JUAN REYES AND CATHERINE REYES,

*Defendants–Appellants.*

Before:   CABRANES AND MENASHI, *Circuit Judges*, and LIMAN, *District Judge.*[*]

---

[*]  Judge Lewis J. Liman, of the United States District Court for the Southern District of New York, sitting by designation.

Defendants-Appellants Juan and Catherine Reyes appeal from a judgment of the United States District Court for the Eastern District of New York (Margo K. Brodie, *C.J.*) granting summary judgment to the United States and enforcing civil penalties against them for failing to timely file a Report of Foreign Bank and Financial Accounts disclosing their financial interest in a jointly-held foreign account pursuant to 31 U.S.C. § 5321. The Reyeses also appeal the district court's order granting the United States' motion to reopen the case and entering judgment plus additional statutory interest and late payment penalties pursuant to 31 U.S.C. § 3717(e)(2). On appeal, they argue that the district court's grant of summary judgment was improper because it could not have determined that they acted willfully as a matter of law, and that the district court misunderstood the six percent late payment penalty as mandatory.

The district court did not err in holding that "willful" as used in the statute encompasses reckless conduct, nor in applying that standard in granting summary judgment to the United States. The district court similarly did not err in imposing a six percent late payment penalty pursuant to controlling Treasury Department regulations.

Accordingly, we **AFFIRM** the orders of the district court.

---

> CLINT A. CARPENTER, (Julie Ciamporcero Avetta *on the brief*), United States Department of Justice, Washington, D.C., *for Plaintiff–Appellee*.
>
> JEAN-CLAUDE MAZZOLA, Mazzola Lindstrom LLP, New York, NY, *for Defendants–Appellants*.

---

LIMAN, *District Judge*:

The United States Treasury Department, under authority of the Bank Secrecy Act, requires each United States person having a financial interest in a bank, security, or other financial account in a foreign country to report such relationship to the Commissioner of Internal Revenue in a Report of Foreign

Bank and Financial Accounts (FBAR). 31 C.F.R. §§ 1010.306(c), 1010.350(a). Failure to file an FBAR is punishable by a civil penalty. 31 U.S.C. § 5321(a)(5)(A). The maximum penalty increases in cases of willful violations. *Id*. § 5321(a)(5)(C). Defendants-Appellants Juan and Catherine Reyes are the holders of a foreign bank account that was opened for Juan in the early 1970s. By 2010, the foreign bank account comprised the majority of their wealth and a major source of their income. They never filed an FBAR as required by federal law. In 2018, the Internal Revenue Service (IRS) notified the Reyeses that they were liable for willfully failing to file an FBAR in 2010, 2011, and 2012. The Reyeses then failed to pay the penalties assessed against them, and in 2021, the United States brought suit to convert the penalties to a money judgment.

The district court (Margo K. Brodie, *C.J.*) entered summary judgment for the United States upon completion of discovery. The court determined that the undisputed evidence established that the Reyeses had willfully failed to file an FBAR. It did so on the basis that willful as used in the statute encompasses reckless conduct in addition to intentional conduct. The court accepted the IRS's calculation of penalty amounts to be assessed under 31 U.S.C. § 5321(a)(5)(C)(i) and entered judgment in the amount of $420,051 plus interest and a six percent late payment penalty of $84,102.26 under 31 U.S.C. § 3717(e)(2). Before the court entered final judgment, the Reyeses challenged the district court's imposition of the late payment penalty. The court determined that the

3

six percent penalty was mandatory under Treasury regulations issued pursuant to the governing statute and affirmed its prior calculation.

We conclude that the district court was correct to grant summary judgment to the United States. The standard for willfulness under 31 U.S.C. § 5321 encompasses recklessness, and the undisputed evidence establishes that the Reyeses acted recklessly in failing to file an FBAR. Furthermore, the district court was correct that the six percent late payment penalty is mandatory under governing Treasury Department regulations.

Accordingly, the decision of the district court is Affirmed.

## BACKGROUND

### I. Statutory Background

The Bank Secrecy Act of 1970 directs the Secretary of the Treasury to require residents and citizens of the United States to "keep records and file reports" when they "make[] a transaction or maintain[] a relation for any person with a foreign financial agency." 31 U.S.C. § 5314(a). Further, "[a] person shall be required to disclose a record required to be kept under this section or under a regulation under this section only as required by law." *Id.* § 5314(c). Under that authority, the Secretary of the Treasury has adopted regulations that require any person "having a financial interest in, or signature or other authority over" a bank account in a foreign country "to report such relationship to the Commissioner of Internal Revenue for each year in which such relationship exists." 31 C.F.R. § 1010.350(a). Such a report is known as a Report of Foreign Bank and Financial Accounts, or FBAR. *Id.*

4

As amended in 1986, the Bank Secrecy Act authorizes the Secretary of the Treasury to "impose a civil money penalty on any person who violates, or causes a violation of," the Act's reporting requirements. *See* 31 U.S.C. § 5321(a)(5)(A). The penalty is calibrated based on whether the violation was willful. As amended in 2004, the penalty is capped at $10,000 for violations that are not willful. *Id*. § 5321(a)(5)(B). But for willful violations, "the maximum penalty . . . shall be increased to the greater of" $100,000 or fifty percent of "the balance of the account at the time of the violation." *Id*. § 5321(a)(5)(C), (D)(ii). The Secretary of Treasury has delegated the authority to investigate and assess such Bank Secrecy Act violations to the IRS. 31 C.F.R. § 1010.810(g). Although an FBAR is not a tax form, the IRS alerts individuals on their tax forms—specifically, on Form 1040, Schedule B, Line 7a—to their potential obligations to file an FBAR. *See* Joint App'x 632.

The IRS is responsible for collecting any civil penalties assessed for violations of the FBAR reporting requirement. 31 C.F.R. § 1010.810(g). The Federal Claims Collection Act (FCCA) governs the interest rates and penalties that attach to debts owed by persons to the federal government. It clarifies that as to penalties for late payment, the "head of an executive, judicial, or legislative agency shall assess on a claim owed by a person . . . a penalty charge of not more than 6 percent a year for failure to pay a part of a debt more than 90 days past due." 31 U.S.C. § 3717(e)(2). The Treasury Department, which houses the IRS and is therefore tasked with assessing and collecting FBAR penalties, has set the penalty rate at six percent per year. 31 C.F.R. § 5.5(a).

## II.  Factual Background

Dr. Juan Reyes was born in Nicaragua and moved to the United States in 1960, where he has lived since.   He is a surgeon.   He became a United States citizen in 1982 but maintained his Nicaraguan citizenship.   His wife, Catherine Reyes, is a United States citizen born in the United States.   During the relevant period, Dr. Reyes worked as a surgeon in private practice and Mrs. Reyes assisted him with some business-related aspects of the job.

In 1972, Dr. Reyes' parents opened an account in his name at Banco de Londres y America del Sur (which later became Lloyds Bank) in Managua, Nicaragua.   His parents added approximately $200,000 dollars to the account. No other money was added to the account, but the total amount continued to grow "on its own through market gains."   Joint App'x 160.   In the 1990s, the account was transferred to Lloyds Bank PLC in London, and Mrs. Reyes was added as a joint owner.   As a result, both parties had signature authority over the account.   The joint account was at some point transferred to Lloyds TSB Bank in Switzerland.

The Reyeses made withdrawals of approximately a few thousand dollars a month both in cash and using credit cards while the money was held in the account in Switzerland, beginning in around 2003.   The couple had these credit card statements mailed to a friend in Spain.   Mrs. Reyes also applied for another linked credit card from Madrid, although the couple never lived or resided there. Dr. Reyes communicated by mail, fax, telephone, and occasionally in person about the foreign account with a representative of Lloyds Bank named Bernard Gaughran.   In 1994, the Reyeses instructed the bank "to retain in future all

6

my/our correspondence" (i.e., not send mail related to the account to their address in the United States), a service for which they paid a fee. Joint App'x 196, 198. A few years later, in 2000, the Reyeses each signed declarations stating that they did "not authorize" the bank to "make any disclosure in connection with the US withholding tax," and that they prohibited the bank from "invest[ing] in further US securities on [their] account." Joint App'x 624–25. They selected that option on a form specific to persons with U.S. tax liability, where the only other option was one under which the Bank would "deliver the W-9 form to its US Securities Custodian." *Id.*

In the years relevant to this litigation, the Reyeses' Swiss bank account contained just over two million U.S. dollars ($2,053,423.00 in 2012). Joint App'x 618. That value comprised at least 75%, and up to 90%, of the couple's total assets.

The Reyeses had their accountant Sidney Yoskowitz prepare their tax returns and, upon completion of the returns and after a review for accuracy, the Reyeses signed them. Yoskowitz, as a matter of course, requested that his clients fill out a "Client Organizer," in which he asked if the filer had any interest in a foreign bank account. The Reyeses nevertheless did not return the client organizer, and never otherwise disclosed the Lloyds account to Yoskowitz. For the years 2010, 2011, and 2012, the Reyeses reported to the IRS that they had no interest in any foreign financial account. Joint App'x 632, 637, 645.[1] Nor did

---

[1] The record is silent as to all other years for which the Reyeses possessed the foreign bank account.

their tax forms for those three years report any interest or other income from the Lloyds account. Dr. Reyes testified that it was his understanding, based on an article that he read, that as a Nicaraguan citizen he was not required to report the foreign income.

Eventually, the Reyeses requested that the funds be transferred from Lloyds Bank to their J.P. Morgan account in the United States. Dr. Reyes testified that he first became aware of the FBAR requirement when he brought the money from Switzerland into the United States in late 2013. After consulting with a U.S. lawyer, the Reyeses filed amended tax returns for 2010, 2011, and 2012. Initially, the Reyeses considered participating in the IRS's Offshore Account Voluntary Disclosure Initiative, which would have permitted them to "regularize" their accounts and "resolve any and all reporting issues in the United States" by filing amended returns for the years in question and paying associated penalties. Joint App'x 217. They ultimately decided to withdraw from the program because the penalty of approximately $600,000 was "too high." Joint App'x 299–300.

The IRS contacted the Reyeses in July of 2018 and informed them that they were liable for civil penalties under 31 U.S.C. § 5321 for willfully failing to report their ownership of the foreign bank account. The IRS concluded that the conduct of each was willful on the basis that they held a "significant amount of [their] financial assets" in the foreign bank account in a country with which they have no ties, used credit cards linked to that account, and neither informed their accountant nor reported to the IRS that they had any interest in a foreign bank account. Joint App'x 740, 758. As to Dr. Reyes, the IRS noted also that he is

8

"highly educated and has been in the U.S. for more than 40 years."   Joint App'x 740.

The IRS calculated a penalty based on the statutory maximum civil penalty for willful violations, which in this case was fifty percent of the balance in the account at the date of the violation, applied to each defendant.   31 U.S.C. § 5321(a)(5)(C).   The IRS concluded, however, that this penalty would be "too severe," and accordingly assessed a mitigated penalty of $516,065 each for all three years ($172,022 each for 2010, $177,022 each for 2011, and $172,021 each for 2012).   Joint App'x 748, 766.   The Reyeses successfully protested the proposed penalties to the IRS Independent Office of Appeals, which reduced them by twenty percent to $420,051 each.   Appellee's Brief at 16.   In 2019, both Dr. and Mrs. Reyes signed forms agreeing to the assessment and collection of that reduced penalty.   Joint App'x 783–87.   The IRS explained that there would be a late payment penalty charge of six percent per year for any amount unpaid within ninety days of November 21, 2019.   Joint App'x 778, 781.

As of February 21, 2023, the Reyeses had not made the required payments. They each owed the amounts in full plus a late payment penalty calculated by the IRS under Treasury Regulations of $84,102.   Joint App'x 70–71.

### III.   District Court Proceedings

Following the Reyeses' failure to pay according to the agreement signed in 2019, the United States initiated suit under 31 U.S.C. §§ 3711(g)(4)(C) and 5321(b)(2) to obtain a money judgment in the amount of the penalties.   The latter section gives the Secretary of the Treasury authority to commence a civil action to recover a civil penalty assessed for not filing an FBAR.   *Id.* § 5321(b)(2).

9

At the conclusion of discovery, the United States moved for summary judgment against the Reyeses on the basis that the undisputed evidence proved that their FBAR violations were at least reckless, thereby establishing willfulness as a matter of law.   Joint App'x 29.   The Reyeses opposed the United States' motion by arguing that recklessness is insufficient to establish willfulness under 31 U.S.C. § 5321(a)(5)(C), and that there remained a dispute of material fact as to whether they were reckless, thereby precluding summary judgment.   Joint App'x 794.

The district court granted the United States' motion for summary judgment.   The court held first that "[c]onsistent with all the courts that have considered this issue, the [c]ourt finds that a showing that Defendants recklessly failed to [file] FBARs would result in civil penalties under Section 5321(a)(5)(C)." *United States v. Reyes*, No. 21-cv-5578, 2024 WL 437096, at *6 (E.D.N.Y. Jan. 10, 2024).   In doing so, it rejected the Reyeses' argument that civil willfulness is a subjective standard that requires a showing of an intentional violation.   Under the objective recklessness standard, the district court found that even "[c]onstruing the evidence in Defendants' favor," there was no genuine issue of material fact as to their liability.   *Id*.   In sum, it determined that the Reyeses' "undisputed failure to review their incorrect tax returns in advance of the filing of the returns, as well as the additional undisputed evidence, demonstrates that they acted, at a minimum, recklessly when they failed to file FBARs in 2010, 2011, and 2012, and they are therefore subject to enhanced penalties for a willful violation" of the statute.   *Id*. at *7.

Before the district court entered final judgment, the Reyeses also challenged the court's calculation of a six percent late payment penalty under 31 U.S.C. § 3717(e)(2) and 31 C.F.R. § 5.5(a). They argued that the statute leaves the calculation to the court's discretion, and that a lower percentage should be applied. The court rejected that argument, holding that because the Department of Treasury set the minimum rate to be applied at six percent per year, the court did not have discretion to reduce the amount of the penalty. *See United States v. Reyes*, No. 21-cv-5578, 2024 WL 2293750, at *2–3 (E.D.N.Y. May 21, 2024).

## DISCUSSION

Defendants-Appellants Dr. and Mrs. Reyes argue that the district court incorrectly held that willfulness under 31 U.S.C. § 5321(a)(5)(C) encompasses reckless conduct, and that there remained genuine issues of material fact fit for resolution by trial. They also argue that the district court was incorrect in holding that it did not have discretion to depart from the six percent late payment penalty set by the Department of Treasury.

This Court reviews a district court's grant of summary judgment *de novo*, "construing the evidence in the light most favorable to the party against whom summary judgment was granted and drawing all reasonable inferences in that party's favor." *Horn v. Med. Marijuana, Inc.*, 80 F.4th 130, 135 (2d Cir. 2023). Questions of statutory and regulatory interpretation are also reviewed *de novo*. *See Monti v. United States*, 223 F.3d 76, 81 (2d Cir. 2000).

11

## I.  Summary Judgment Under 31 U.S.C. § 5321(a)(5)(C)

The Bank Secrecy Act permits the United States to impose a civil penalty of up to fifty percent of the balance of an unreported account against persons who "willfully" fail to file an FBAR.   31 U.S.C. § 5321(a)(5)(C).   The district court held that the term "willfully" as used in the statute incorporates reckless conduct and is not limited to knowing infractions.   It next held that there was no genuine dispute of material fact as to whether the Reyeses' conduct met that standard and it therefore granted summary judgment to the United States.   The district court committed no error on either front.

### A.  "Willful" in 31 U.S.C. § 5321(a)(5)(C) Encompasses Recklessness

The Bank Secrecy Act imposes harsher civil penalties for "willful" violations of the statute than it does for other violations.   *Compare* 31 U.S.C. § 5321(a)(5)(B), *with id.* § 5321(a)(5)(C).   The Supreme Court has recognized that "willful" "is a 'word of many meanings' and 'its construction is often influenced by its context.'"   *Ratzlaf v. United States*, 510 U.S. 135, 141 (1994) (quoting *Spies v. United States*, 317 U.S. 492, 497 (1943)) (alterations omitted).   When willfulness is a "condition of civil liability," however, the Supreme Court has "generally taken it to cover not only knowing violations of a standard, but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007).   Such a construction "reflects common law usage, which treated actions in 'reckless disregard' of the laws as 'willful' violations."   *Id.* (quoting W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser and Keeton on the Law of Torts § 34, at 212 (5th ed. 1984)).   Statutory interpretation of the term "willful" in the civil context stands in sharp contrast to its construction in the criminal context, where it is understood "as limiting

12

liability to knowing violations," i.e., the violation of a "known legal duty." *Id.* at 57 n.9 (citing *Cheek v. United States*, 498 U.S. 192, 200–01 (1991)).

Although "'the term recklessness is not self-defining,' the common law has generally understood it in the sphere of civil liability as conduct violating an objective standard: action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Id.* at 68 (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)). In *Safeco*, the Supreme Court cited with approval the formulation of the Second Restatement of Torts that conduct is reckless where the actor "does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk . . . but also that such risk is substantially greater than that which is necessary to make his conduct negligent." *Id.* at 69 (quoting Restatement (Second) of Torts § 500 (1963)); *see also* Restatement (Second) of Torts § 500 cmt. g (1965) (explaining that whereas negligence denotes "mere inadvertence, incompetence, [or] unskillfulness," recklessness "requires a conscious choice of a course of action.").

As a matter of course, Congress' use of "willful" in a civil statute is presumed to carry with it the "common law meaning" that encompasses recklessness, "absent anything pointing another way." *Safeco*, 551 U.S. at 58; *see also Beck v. Prupis*, 529 U.S. 494, 500–01 (2000) ("[W]hen Congress uses language with a settled meaning at common law," it "'presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken.'") (quoting *Morissette v. United States*, 342 U.S.

13

246, 263 (1952)); Felix Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum L. Rev. 527, 537 (1947) ("[I]f a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it."). Here, as in *Safeco*, "[t]here being no indication that Congress had something different in mind, we have no reason to deviate from the common law understanding in applying the statute." 551 U.S. at 69. For the same reason, the Supreme Court has frequently reiterated that a statute creating civil liability for "willful" conduct encompasses reckless conduct as well. *See id.* at 60 (Fair Credit Reporting Act); *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 132–33 (1988) (Fair Labor Standards Act); *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 125–26 (1985) (Age Discrimination in Employment Act).

Every court of appeals to consider the construction of "willful" in Section 5321 of the Bank Secrecy Act has determined that civil liability lies where the United States proves the defendant acted at least recklessly. In *United States v. Hughes*, the Ninth Circuit held that "*Safeco*'s reasoning applies equally to civil FBAR penalties.". 113 F.4th 1158, 1161 (9th Cir. 2024). Similarly, the Third Circuit has determined that willfulness in 31 U.S.C. § 5321 encompasses recklessness, joining the "general consensus among courts." *Bedrosian v. U.S. Dep't of Treas., IRS*, 912 F.3d 144, 152 (3d Cir. 2018). The Ninth and Third Circuits are joined by the Fourth, Sixth, Eleventh, and Federal Circuits. *See United States v. Horowitz*, 978 F.3d 80, 88 (4th Cir. 2020); *United States v. Kelly*, 92

14

F.4th 598, 603 (6th Cir. 2024); *United States v. Rum*, 995 F.3d 882, 889 (11th Cir. 2021) (per curiam); *Kimble v. United States*, 991 F.3d 1238, 1242 (Fed. Cir. 2021).[2]

This Court has not previously addressed the proof necessary to satisfy the "willfulness" requirement under Section 5321. But the Court now holds, in line with the uniform decisions of the circuit courts that have addressed the issue, that "willfully" as used in 31 U.S.C. § 5321(a)(5)(C) encompasses both intentional and reckless conduct. That is, a person who recklessly fails to report a foreign account as required is liable for the heightened civil penalties for "willful" violations of the statute. This result follows naturally from the Supreme Court's decision in *Safeco*, as the use of "willfully" in the Fair Credit Reporting Act is not materially distinguishable from its use in the Bank Secrecy Act.

The Reyeses' contrary arguments are unconvincing. To support their theory that "willful" in 31 U.S.C. § 5321(a)(5)(C) refers only to intentional conduct, they point to *United States v. Granda*, in which the Fifth Circuit addressed the use of "willfully" in a statute imposing criminal penalties for the illegal transport of monetary instruments and determined that the term required "proof of the defendant's knowledge of the reporting requirement and his specific intent" to commit a violation. 565 F.2d 922, 926 (5th Cir. 1978). The Fifth Circuit's construction of a criminal statute has little persuasive weight in this context given the Supreme Court's guidance in *Safeco* regarding the meaning

---

[2] The Supreme Court has also denied four successive petitions for a writ of certiorari on this very question. *See Rum v. United States*, 142 S. Ct. 591 (2021); *Kimble v. United States*, 142 S. Ct. 98 (2021); *Bedrosian v. United States*, 143 S. Ct. 2636 (2023); *Collins v. United States*, 143 S. Ct. 489 (2023).

of the term "willful" in the civil context.   As the Supreme Court explained in *Safeco*, the common-law meaning of the term willful "is different in the criminal law," where courts "have regularly read the modifier as limiting liability to knowing violations."   551 U.S. at 57 n.9.   The stricter construction of the term in the criminal context follows from the fact that there, the term is "characteristically used to require a criminal intent beyond the purpose otherwise required for guilt."   *Id.*   By contrast, the use of the term in the context of civil liability "presents neither the textual nor substantive reasons for pegging the threshold of liability at knowledge of wrongdoing."   *Id.*

The Reyeses argue that because 31 U.S.C. § 5321(a)(5)(B)(ii) excuses violations committed "due to reasonable cause," willful should not be understood here to apply to non-intentional conduct.   That conclusion does not follow from the structure of the statute.   Subsection (5)(A), which permits the Secretary of Treasury to "impose a civil money penalty on any person who violates" a provision of Section 5314, contains no *mens rea* requirement.   31 U.S.C. § 5321(a)(5)(A).   Subsection (B)(ii) clarifies, however, that "no penalty shall be imposed under subparagraph A with respect to any violation if such violation was due to reasonable cause," and if "the amount of the transaction or the balance in the account at the time of the transaction was properly reported." *Id.* § 5321(a)(5)(B)(ii).   Subparagraph (B) thus creates a defense to what otherwise might be read as a strict liability provision.   That is confirmed by the fact the reasonable cause exception applies "except as provided in subparagraph (C)," which authorizes elevated penalties for willful violations.   *Id.* § 5321(a)(5)(B)(i).   In effect, Congress created a sliding scale: (i) violations

16

committed with reasonable cause but where the balance or transaction is properly reported are not penalized; (ii) violations committed without reasonable cause or without a contemporaneous report are subject to the standard penalty; and (iii) violations committed recklessly or knowingly are subject to an enhanced penalty.

That Congress created an exception to the penalty provision where there was "reasonable cause" for the violation and the amount of the transaction or the balance in the account was properly reported is in no way inconsistent with an enhanced penalty when a violation was reckless. In fact, it would be incongruous to hold that Congress' exception of certain actions taken for reasonable cause would encompass actions taken recklessly, which definitionally are not reasonable.

### B. There Is No Genuine Issue of Material Fact

Having concluded that the district court applied the proper legal standard in Section 5321(a)(5)(C), this Court further holds that the district court did not err in ruling that the standard was met. Based on the undisputed factual record, there is no "evidence on which the jury could reasonably find" that the Reyeses were not reckless in failing to disclose their foreign bank account. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). It was therefore appropriate for the district court to grant summary judgment to the United States.

The standard for recklessness in the civil context is an objective one, which imposes civil liability for conduct entailing "an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Safeco*, 551 U.S. at

17

68 (quoting *Farmer*, 511 U.S. at 836). "It is this high risk of harm, objectively assessed, that is the essence of recklessness at common law." *Id.* at 69; *see* Restatement (Second) of Torts § 500 cmt. a (noting that a defendant "is held to the realization of the aggravated risk which a reasonable man in his place would have, although he does not himself have it"). The standard is similar to the standard that this Court has adopted for violations of securities laws, pursuant to which we define recklessness as "conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (quoting *Rolf v. Blyth Eastman Dillon & Co., Inc.*, 570 F.2d 38, 47 (2d Cir. 1978)) (alterations omitted). The Court in *Novak* explained that "an egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of recklessness." *Id.* (quoting *Chill v. General Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996)) (alterations omitted).

Other circuits to address the recklessness standard in the FBAR context have explained the concept similarly. Drawing on prior cases addressing civil penalties under the Tax Code, the Third Circuit held that recklessness in not filing an FBAR is established where the defendant "(1) clearly ought to have known that (2) there was a grave risk that the filing requirement was not being met and if (3) he or she was in a position to find out very easily." *Bedrosian*, 912 F.3d at 153 (quoting *United States v. Carrigan*, 31 F.3d 130, 134 (3d Cir. 1994)). That articulation of the standard has been widely adopted. *See Horowitz*, 978

18

F.3d at 89 (adopting the *Bedrosian* formulation of recklessness); *Kelly*, 92 F.4th at 603–04 (same); *Hughes*, 113 F.4th at 1162 (same); *Rum*, 995 F.3d at 889–90 (same).

The district court correctly determined that the Reyeses failed to offer evidence creating a genuine issue of fact that they acted recklessly with respect to reporting their foreign bank account. The undisputed evidence before the district court included that during the years in question, the Reyeses had over two million dollars in their Swiss bank account and that the account made up between 75% and 90% of their wealth. Joint App'x 56, 800. The account generated substantial income—over the years from 1972 to 2012, it grew from the $200,000 that was initially deposited to $2,101,330. It was undisputed that the Reyeses were aware of the wealth they kept abroad in Switzerland, as they regularly drew on the funds in the amount of "a few thousand dollars a month" using credit cards linked to the foreign account. *See* Joint App'x 159, 178–85.

The record is replete with further undisputed evidence that the Reyeses acted with an unjustifiably high risk of harm that was either known to them or so obvious that it should be known. *See Safeco*, 551 U.S. at 68. The Reyeses took several steps that ensured the foreign bank account, and their domestic use of its funds, would not be reported to U.S. tax authorities. First, the Reyeses had the credit cards they used to spend the foreign money registered and picked up in Spain, despite never having lived there and visiting only occasionally. Joint App'x 57, 800–01. They set up payments for those cards to be automatically deducted from the foreign account. Joint App'x 213. Second, the Reyeses specifically instructed Lloyds Bank not to send mail related to the account to their address in the United States, a service for which they paid a fee. Joint

19

App'x 55–56, 621, 799.   Third, they directed the Swiss bank not to invest in any U.S. securities.   Joint App'x 56, 800.   The document the Reyeses signed instructing as much, provided to them by the bank, clarified that "[i]n connection with US Withholding Tax and the holding of US securities through a US custodian, I, the account holder declare that . . . I hold American Citizenship (sole or dual citizenship)."   The form then provided the account holder with just two options to select from: (1) "I enclose a validly signed and completed W-9 form. I understand that the Bank will deliver the W-9 form to its US Securities Custodian," and (2) "I do not authorize you to make any disclosure in connection with the US Withholding Tax.   I therefore authorize you to sell all my US Securities with you," and "you will not invest in further US Securities on my account."   Joint App'x 624–25.   Both Dr. and Mrs. Reyes selected the second option.   *Id.*

The Reyeses were specifically asked by the IRS and by their accountant whether they possessed a foreign account.   That question, as posed by a trusted professional with responsibility for reporting the requested information to the federal government, would have alerted a reasonable person that the possession of a foreign account was relevant to federal reporting.   Yet the Reyeses failed to report the Swiss bank account.   The Reyeses filed their taxes through an accountant, Mr. Yoskowitz, whose standard practice was to request a "client organizer" and ask whether his clients had any foreign income.   But the Reyeses never answered that question, instead sending their accountant completed 1099 forms to inform him of only their domestic income.   Joint App'x 58, 628, 801. Nor did they inform Mr. Yoskowitz that they had a foreign bank account at any

20

other point in the tax filing process.   Joint App'x 59, 801.   The tax forms he prepared on their behalf contain a question under "Part III Foreign Accounts and Trusts" inquiring: "[a]t any time during [the past year], did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account or other financial account?"   Joint App'x 632.   The forms submitted by the Reyeses to the U.S. government falsely answered that question "No."   Joint App'x 802; *see* Joint App'x 632, 637, 645. They were submitted after Dr. Reyes "probably" reviewed them.   Joint App'x 802.

The amount of funds, particularly relative to the rest of the Reyeses' wealth, and the fact that they used the money to cover domestic expenses using foreign cards shows that it was "obvious" and "should have been known" that such income needed to be reported in the United States.   *See Farmer*, 511 U.S. at 836.   Put differently, a "reasonable [person] in [their] place" would have thought it necessary to investigate whether such a large sum that generated income and was used domestically should be reported to the IRS.   Restatement (Second) of Torts § 500 cmt. a.   It is important, too, that the Reyeses were presented with multiple documents—including the bank form instructing Lloyds to divest from U.S. securities, the client organizer sent by Mr. Yarowitz, and the tax forms submitted by the Reyeses to the IRS—all making explicit that U.S. reporting obligations might attach to foreign bank accounts.   It was not reasonable for the Reyeses to ignore these indicators of potential liability.

This Circuit has also "found allegations of recklessness to be sufficient where plaintiffs alleged facts demonstrating that defendants failed to review or

21

check information that they had a duty to monitor, or ignored obvious signs of fraud." *Novak*, 216 F.3d at 308. Even a "cursory glance" at the document instructing Lloyds to divest from U.S. securities, or the section on their tax forms inquiring whether they had a foreign account, would have "brought the [requirement] to [their] attention." *Hayman v. Comm'r*, 992 F.2d 1256, 1262 (2d Cir. 1993).

Other circuits agree. In *Horowitz*, the Fourth Circuit determined that the defendants' repeated failure "to review the returns with the care sufficient at least to discover the misrepresentation of foreign bank accounts, while nonetheless stating that the returns were accurate, was again an aspect of their recklessness." 978 F.3d at 90. The Federal Circuit similarly held that "a taxpayer signing their returns cannot escape the requirements of the law by failing to review their tax returns." *Kimble*, 991 F.3d at 1242.[3] In sum, the Reyeses were in possession of information that gave rise to a substantial risk that they needed to report their foreign account to the IRS, and they easily could have ascertained whether in fact they were required to do so, but they neither informed their accountant of their foreign account nor asked whether they had

---

[3] On appeal, as below, the Reyeses argue that the absence of a signature on their tax forms is indicative of a lack of willfulness. Appellants' Brief at 21. As explained in a declaration by IRS Revenue Agent Kimberly Nguyen, tax forms like the Reyeses' submitted electronically do not contain a taxpayer's handwritten signature. Joint App'x 825. The important point is that the Reyeses do not dispute that they authorized the filing of their tax returns. *Contra Rocha v. Bakhter Afghan Halal Kababs, Inc.*, 44 F. Supp. 3d 337, 348 (E.D.N.Y. 2014) (questioning the authenticity of unsigned and unsworn tax forms where the plaintiffs had "sufficiently challenged the reliability of the information contained in the tax returns").

any reporting obligations.  *See Bedrosian*, 912 F.3d at 153.  They were therefore reckless as to the requirement to file an FBAR.

The Reyeses do not dispute that the Swiss account held the majority of their wealth, that the obligation to report a foreign account was noted in multiple documents sent to them, or that they took actions that would reasonably be understood to conceal the Swiss account from the attention of the United States authorities.  They resist the compelling force of the evidence by arguing that they *subjectively* believed they had no legal duty to report their foreign account. Dr. Reyes points to his testimony that he declined to report his foreign income based on a newspaper column and conversations with international lawyers. But that testimony, even if credited, as it must be, does not create a genuine issue of material fact.  It goes only to whether the Reyeses themselves subjectively believed that their foreign account was subject to the FBAR requirements, rather than to whether a reasonable person in their position should have been aware of the high risk that they had an obligation to report the account.  As one court in this Circuit has explained, "a defendant's subjective belief does not negate a finding of recklessness or willful blindness, particularly where, as here, a defendant could easily have determined whether his belief was accurate by speaking with a longtime tax preparer."  *United States v. Gentges*, 531 F. Supp. 3d 731, 750 (S.D.N.Y. 2021).  In fact, the Reyeses' contention cuts the other way, for if "the question of whether they had to pay taxes on foreign interest income was significant enough" that Dr. Reyes read up on it or discussed it with international lawyers, he was "reckless in failing to discuss the same question with [his] accountant at any point."  *Horowtiz*, 978 F.3d at 89.

The Reyeses posit that the undisputed facts do not clearly establish recklessness because they were not sophisticated businesspeople, and that someone in their position would not have known to report the foreign income. Dr. Reyes is a surgeon in private practice and Mrs. Reyes assists him in running that business. In any event, there is no support for the notion that the penalty assessment under 31 U.S.C. § 5321 turns upon a taxpayer's station in life. The inquiry turns on whether a "reasonable man" would have realized "not only that his conduct creates an unreasonable risk . . . but also that such risk is substantially greater than that which is necessary to make his conduct negligent." *Safeco*, 551 U.S. at 69 (quoting Restatement (Second) of Torts § 500, p. 587 (1963)). In other words, the recklessness inquiry turns upon whether a reasonable person, not the Reyeses specifically, would have been aware of the high risk of not reporting the foreign account given the information in their possession and nonetheless failed to take action (*i.e.*, whether the risk was known or obvious).[4]

The Reyeses rely also on *United States v. Bittner*, in which the court noted that the taxpayer was a "sophisticated businessman" in rejecting a reasonable-cause defense under 31 U.S.C. § 5321(a)(5)(B)(ii)(I). 19 F.4th 734, 743 (5th Cir. 2021). The Reyeses argue that they are not sophisticated businesspeople and thus must be held to a lesser standard. But *Bittner* is inapposite. For one, the

---

[4] Other circuits have upheld findings of willfulness against a schoolteacher, *see United States v. Hammers*, 942 F.3d 1001, 1113 (10th Cir. 2019), an anesthesiologist, *Horowitz*, 978 F.3d at 82; *Kelly*, 92 F.4th at 605, a businessman in the pharmaceutical industry, *Bedrosian*, 912 F.3d at 147, and the owner of a delicatessen, pet store, and supply store, *see Rum*, 995 F.3d at 884.

court was construing and applying the "reasonable cause" standard rather than the recklessness standard. *Id.* at 741. For another, it is not clear that the reference to the taxpayer's business sophistication was intended to establish a test whereby a judge or a jury would assess penalty liability based on their assessment of business acumen. The taxpayer in *Bittner* claimed that he spoke little English and, despite being a United States citizen, had spent little time in the United States; he instead lived in Romania, where he complied with Romanian tax laws. *Id.* at 743. It thus was responsive for the court to note that he was not unsophisticated. It hardly follows that the Reyeses are not subject to a willfulness penalty despite all the information in their possession because they are in medicine rather than in business.

Even viewing the evidence in the light most favorable to the Reyeses, there is no genuine issue of material fact as to whether they acted in reckless disregard of the FBAR reporting requirements.

## II.     Late Payment Interest

The Reyeses' second argument on appeal is that the district court committed reversible error in adopting the penalty interest rate of six percent established by Treasury Department regulations. Under the FCCA, agencies of the federal government must assess interest rates and penalty charges owed to them by individual debtors. *See* 31 U.S.C. § 3717. As to penalty charges for late payments specifically, the FCCA mandates that "[t]he head of an executive, judicial, or legislative agency shall assess on a claim owed by a person . . . a penalty charge of not more than 6 percent a year for failure to pay a part of a

debt more than 90 days past due." *Id.* § 3717(e)(2).[5]   An "executive, judicial, or legislative agency" is defined by the statute as "a department, agency, court, court administrative office, or instrumentality in the executive, judicial, or legislative branch of Government, including government corporations." *Id.* § 3701(a)(4).   By the statute's plain terms, the executive, legislative, and judicial branches all have the authority, within limits, to establish the penalty charge on debts owing to them.

The Reyeses owed a debt to the IRS, which sits within the Treasury Department and is charged with "assess[ing] and collect[ing] civil penalties under 31 U.S.C. § 5321." 31 C.F.R. § 1010.810(g).   As the "executive agency" charged with assessing and collecting the relevant penalty through the IRS, the Treasury Department has determined via an agency rulemaking that "[p]enalties shall accrue at the rate of 6% per year, or such other higher rate as authorized by law." *Id.* § 5.5(a).   Those Treasury regulations apply "to the Treasury Department when collecting a Treasury debt [and] to persons who owe Treasury debts." *Id.* § 5.2(b)(1).   Accordingly, the district court committed no error in applying the penalty rate set by the Treasury Department regulations.

The Reyeses' contrary argument conflates the terms "executive, judicial, or legislative."   In their reading, because they did not pay the amounts assessed by the IRS but chose to allow the IRS to sue them for those funds, they earned the

---

[5] The FCCA originally permitted assessment and collection by only "the head of an executive or legislative agency."   It was amended in 1996 by the Debt Collection Improvement Act to include "judicial" agencies.   Pub. L. No. 104–134, § 31001(c)(1), 110 Stat. 1321, 1321–59 (1996). The Act was amended with the intent to "maximize collections of delinquent debts owed to the Government." *Id.* § 31001(b)(1).

26

ability to have the interest rate determined by a member of the judicial "agency." But that reading would lead to absurd results. The FCCA refers to the "head" of the relevant "executive, judicial, or legislative agency," and not to an individual district judge. And the FCCA is a general statute that applies to all debts owed by individuals to the federal government. It directs the head of any given federal agency—be it executive, judicial, or legislative—to "collect a claim of the United States Government for money or property arising out of the activities of, or referred to, the agency." 31 U.S.C. § 3711(a)(1). It does not contemplate the head of an agency in one branch of government determining the penalty charge for a debt owing to another branch of government. And it certainly does not permit a court to override the considered judgment of an executive agency regarding the penalty rate, within statutory limits, to be applied when a debt is incurred to that executive agency. *Id.* § 3717(e)(2). Had Congress intended that result, it could simply have specified that a penalty was to be determined in the discretion of the court in an amount no greater than six percent.

The Reyeses specifically negotiated the payment of their civil penalty arising from their failure to file an FBAR with the IRS. *See* Joint App'x 735–52, 753–70. They agreed to the assessment and to the collection of penalties on that basis. Joint App'x 783, 785. Upon making that agreement, the IRS informed the Reyeses that "[a] late payment penalty charge of 6% each year will be assessed on any amount of the penalty that remains unpaid 90 days from the date of this letter." Joint App'x 778, 781. The Reyeses, unhappy with that result, do not get an opportunity to challenge the Treasury Department's

27

assessment of the appropriate penalty by the mere contrivance of not paying and waiting for a lawsuit.[6]

The district court committed no error in applying a six percent late payment penalty for the Reyeses' failure to make timely payment.

## CONCLUSION

The judgment of the district court is AFFIRMED.

---

[6] The Reyeses have not argued that Treasury's regulations are themselves contrary to law or that they contravene the governing statute. Their citation to *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) is therefore inapposite.